UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

__Joy Fogg__

    __v.__                                     Civil No. 11-cv-164-PB
                                              Opinion No. 2012 DNH 116
__Michael J. Astrue, Commissioner,__
__Social Security Administration__

## MEMORANDUM AND ORDER

Joy Fogg seeks judicial review of the decision by the Commissioner of the Social Security Administration denying her applications for supplemental security income, disability insurance, and disabled widow's benefits.  Fogg alleges that the decision of the Administrative Law Judge ("ALJ") who considered her applications is not supported by substantial evidence and that the ALJ improperly discounted both the medical opinions of her treating physicians and her subjective pain complaints.  For the reasons provided below, I grant Fogg's motion to reverse the Commissioner's decision.

## I.    BACKGROUND[1]

Fogg is fifty-three years old, and discontinued her education after graduating from high school.  Tr. 28.  Fogg's past

---

[1] Except where otherwise noted, the background information is drawn from the parties' Joint Statement of Material Facts (Doc. No. 11).  See LR 9.1(b).  I cite to the administrative record with the notation "Tr."

relevant work included electronics parts assembly, as well as
work as a stenciler, garment folder, and hand packager in the
textile industry.  Tr. 46-47.  She stopped working to care for
her ill husband who died in May 2005.  Fogg alleges that
degenerative disc disease of her lower back, kidney disease,
dizzy spells, depression, hypertension, blurred vision,
diarrhea, diabetes, female stress incontinence, migraines, and
gastric reflux caused her to become disabled as of December 31,
2006.  Pl's Mem. Of Law in Support of Mot. for Order Reversing
the Decision of the Comm'r.  (Doc. No. 8-1).

## A.  <u>Procedural History</u>

On June 11, 2008, Fogg filed applications for supplemental
security income, disability insurance and disabled widow's
benefits.  Following the initial denial of her claim, Fogg
requested an administrative hearing before an ALJ, which she
attended on September 27, 2010.  At the hearing, Fogg and a
vocational expert testified, and she was represented by counsel.

The ALJ issued a decision dated October 26, 2010, denying
Fogg's applications.  The Decision Review Board ("DRB") selected
her claim for review, but did not complete its review of Fogg's
claim within the allotted time, thereby leaving the ALJ's
decision as the final decision of the Commissioner.

**B.**  __Medical Evidence__

Fogg alleges various medical conditions that, in combination, cause her to be disabled.  Doc. No. 8-1 at 2.  I begin by discussing the evidence that pertains to her renal and urologic conditions and then turn to her complaints of low back pain, depression, and dizziness.[2]

1. Renal and Urologic Conditions

Fogg has consulted various physicians for renal and urologic problems.  On January 11, 2006, Fogg presented to Manchester Urology Associates for stress incontinence and kidney stones.  She returned on February 27 complaining of another kidney stone and pain, for which she was prescribed Percocet and sent for a CT study that showed multiple stones.

During a May 30, 2006 appointment with Dr. Karen Calegari, her primary care physician ("PCP") at the time, Fogg reported that Percocet was helping her pain and that she continued to pass kidney stones.  On July 6, Fogg saw Dr. Rick Phelps, a urologist, for kidney stones and pain.

After two urinalyses showed protein, Fogg was referred to Dr. David Friedenberg, a nephrologist.  On September 6, Dr. Friedenberg noted evidence of vascular disease and recommended

---

[2] I do not discuss in detail the treatment notes related to Fogg's hypertension, blurred vision, diarrhea, diabetes, migraines, and gastric reflux because they are not relevant to my analysis of the issues presented.

3

discontinuation of Fogg's anti-steroidal medications.  Later
that month, following a renal ultrasound and other lab work, Dr.
Friedenberg became concerned that Fogg's left kidney was
shrunken and her blood sugar was elevated.  He ordered a kidney
biopsy, prescribed Lisinopril and referred Fogg to an
ophthalmologist to confirm vessel damage.

Fogg underwent a kidney biopsy on October 16, which showed
significant inflammation and a moderate degree of chronic kidney
damage.  On November 7, Dr. Friedenberg discontinued Renitidine,
because he suspected that the renal problems were caused by an
allergic reaction to the prescription.  The biopsy also revealed
sclerosis of the glomerulus and blood vessels.  Fogg was
instructed on medication and lifestyle changes to manage
vascular disease risk.  On January 12, 2007, Fogg's renal and
urologic issues were stable.  Tr. 480.

An x-ray of Fogg's kidneys on May 15, 2007, showed the
possibility of small stones.  Two days later, Dr. Friedenberg
determined that Fogg's renal failure was stable.  Tr. 444.

On June 5, 2007, Fogg was seen by Dr. Sarah McAleer, a
urologist.  Fogg noted frequently passing stones and continuing
problems with incontinence when coughing or sneezing.  Although
she stated that physical therapy was helping, Fogg reported
wearing five pads a day to absorb the urine.  Dr. McAleer

4

diagnosed her with female stress incontinence without spontaneous leakage and recommended physical therapy.

Later that month, Fogg complained of kidney stones and pressure in her back to Dr. Calegari, who prescribed Percocet. In a follow-up on August 16, Fogg reported passing multiple stones and requested more Percocet, which Dr. Calegari prescribed.

An abdominal x-ray on December 4, and an ultrasound the next day showed kidney stones in both kidneys.  On December 10, Fogg underwent a urologic examination with Dr. McAleer.  Fogg had blood and protein in her urine and a kidney stone.  She stated that she was not bothered by her stress incontinence.  An abdominal x-ray performed on December 18 showed a cluster of between four and five kidney stones in her left kidney, and another, separate stone in the same kidney.

On December 24, Dr. Stephen Smith of Manchester Urology Associates prescribed Percocet for Fogg's back pain and recommended that she increase her water intake.

Fogg presented to Catholic Medical Center on May 31, 2008, for nausea and diarrhea that had lasted one week.  Fogg was diagnosed with acute, chronic renal failure, and was hospitalized for four days.  Tr. 349.  Her renal ultrasound, abdominal x-rays, and EKG were all unremarkable.  On June 10, Dr. Calegari noted that her renal condition had improved.

A few days later, Fogg reported to Dr. McAleer that she was wearing between one and two pads a day to absorb urine, and had passed stone fragments. On September 9, however, Fogg denied experiencing incontinence to her new PCP, Dr. Peter Kiprop.

On December 30, Fogg saw Dr. Alfred Bertagnoll for pain, and an abdominal x-ray showed a stone in Fogg's right kidney. Fogg returned on January 9, 2009, reporting that she had passed the stone, but tests showed an increased risk for kidney stone formation and suboptimal urine volume.

Due to a concerning lab result, on March 12 Dr. Kiprop instructed Fogg to follow up with Dr. Friedenberg, who informed her that her renal function was deteriorating. Tr. 616. He suspected it was caused by renal artery stenosis in one or both kidneys. An April 7 ultrasound showed an atrophic left kidney, which Dr. Friedenberg concluded was evidence of renal artery stenosis, putting her at risk for progression of renal issues and renal failure even though her lab work showed her current kidney functioning at baseline.

Fogg returned to Dr. McAleer on June 22, 2009, complaining of bladder pressure and stress incontinence with moderate improvement. Although an abdominal x-ray did not clearly show a uretal stone, Dr. McAleer concluded that a stone was present, and prescribed Flomax and Percocet. After another abdominal x-ray confirmed the stone's presence, Fogg underwent surgery to

6

remove it on July 8.  During her post-surgery visit on July 31, Fogg was doing well.

Dr. Bijoy Kundu, Fogg's new PCP, noted her history of kidney stones in his office notes from January 7 and February 4, 2010.  Tr. 749, 751.  On April 29, 2010, Fogg's labs showed a rising creatinine level.  When the level continued to rise, several of her prescriptions were stopped.

During her appointment on June 2, Dr. Richmond noted that Fogg's major issue was renal, but on July 7, he noted that her test results were at baseline.  An abdominal CT scan on September 2 showed a renal stone, moderate atrophy of her left kidney, and mild to moderate atherosclerotic disease.

Fogg was admitted to Catholic Medical Center on September 13.  A CT angioaorta test confirmed that her left kidney was shrunken and there was a possible lower renal stone.  She was discharged on September 17 with a diagnosis of atherosclerotic vascular disease.

2.   <u>Low Back Pain</u>

Concurrent with the aforementioned treatment, Fogg also sought treatment for mid and lower back pain.  On September 8, 2006, Fogg was examined by Dr. Calegari, who noted that she ambulated without difficulty, had a full range of motion in her hips, and had point tenderness around L4-5.  Fogg was prescribed a Lidoderm patch.  An x-ray of her lumbar spine performed a few

days later showed possible spondylosis at L5, as well as
degenerative joint disease at L4-5 and L5-S1.  In late
September, Fogg reported that the Lidoderm patch had not helped
her pain.  She was able to walk and bend normally, but reported
increased pain when lying down and getting up.  Dr. Calegari
prescribed Flexeril, but on October 26, Fogg reported that
Flexeril was not helpful.  Dr. Calegari changed her prescription
to Soma and referred Fogg to The Orthopedic Center.

On November 1, Fogg consulted William Mullen, P.A.-C, at
The Orthopedic Center.  He diagnosed her with a lumbar strain,
and recommended continuing physical therapy and modifying her
activities as needed.  At a follow-up appointment later that
month, her lumbar strain had significantly improved.  Tr. 433.
Mr. Mullen recommended that she continue with a home exercise
program and follow up as needed.  Id.

Dr. Calegari prescribed Percocet to treat Fogg's back pain
on July 12 and August 16, 2007.  Tr. 376, 377.  Dr. McAleer
similarly prescribed Percocet to treat Fogg's pain on December
24.

On August 8, 2008, Fogg presented to the Catholic Medical
Center emergency room complaining that a fall had injured her
lower back along with her right knee and wrist.

Fogg presented to Dr. Kiprop on September 9, 2008, for neck
and back pain that radiated down her legs.  Fogg rated the pain

8

at an eight out of ten, stating that it worsened with movement.
She acknowledged that a heating pad helped.

On October 17, Dr. Jonathan Jaffe, a non-examining, non-
treating physician, assessed Fogg's physical residual functional
capacity ("RFC").  He concluded that although her claims of back
pain were credible, Fogg could lift twenty pounds occasionally,
and ten pounds frequently, and that she could push or pull
without restriction.  Tr. 531, 537.  He stated that Fogg could
balance, kneel, bend or crouch occasionally, and could stand,
walk or sit for six hours in an eight-hour workday.  Tr. 531,
532.

A lumbar MRI performed on February 13, 2009 showed
degenerative changes at L4-5 and extruded disc material to the
left at that level.  A cervical MRI revealed a left paracentral
protrusion at C6-7, resulting in mild anterior cord impingement.

On February 15, Fogg presented at the Catholic Medical
Center emergency room for bilateral lower back pain that
worsened with movement.  She reported that the pain had started
in the autumn.  An examination showed a limited range of motion,
tenderness, and pain with straight leg raises.  At a follow-up
with Dr. Kiprop two days later, Fogg reported that the Percocet
she received at the emergency room worked well, though she still
had severe pain that became worse when she walked.  Dr. Kiprop
concluded that Fogg had a chronic backache with acute

exacerbation.  He prescribed Percocet and referred Fogg to a neurosurgeon.  When she returned to Dr. Kiprop's office on March 12, she reported that the medication was not helping her pain. Dr. Kiprop informed Fogg that, due to her renal issues, she had to stop using NSAIDs to relieve her pain.

A month later, Dr. Hughes noted Fogg's one-year history of back pain that affected her sleep and movement.  On April 15, Fogg went to the Dartmouth Hitchcock Medical Center for evaluation of her lower back pain, which she reported had started a year prior.  Nurse Practitioner Linda Brown found that Fogg ambulated regularly, could heel and toe walk, and had pain with palpitation and movement.  Fogg reported having the pain for one year.  Ms. Brown determined that the disc degeneration at L4-5 was the likely cause, but felt it best to wait until Fogg's renal evaluation was completed to address her spinal issue.  Fogg's pain medication was increased, and she was given a book entitled "Treat Your own Back."

On May 13, Fogg was evaluated by Dr. Kiprop for continuing back pain.  She noted that the Neurontin helped, and Dr. Kiprop prescribed more Neurontin.  Fogg complained again, however, of lower back pain on September 17.

Fogg consulted Dr. Kundu on January 7 and February 4, 2010 about her lower back pain.  Tr. 750, 751.  In his medical source statement dated February 22, Dr. Kundu opined that Fogg could

10

not lift or carry more than ten pounds, and could not sit, stand

or walk for more than one hour in an eight-hour work day.  Dr.

Kundu cited degenerative disc disease of the lumbar spine as the

rationale for his opinion.  Tr. 634.

At an appointment on June 2, 2010, Dr. Richmond noted that

Fogg could not use surgery to treat her back pain due to

potential complications of her renal issues.  On July 7, 2010,

Dr. Richmond again noted Fogg's continuing low back pain.

Dr. Richmond completed a medical source statement on

September 29, 2010, opining that Fogg could not carry or lift

more than ten pounds, could not sit for more than 30 minutes at

a time, and could not stand or walk for more than 15 minutes at

a time.  Tr. 741.  In addition, he opined that Fogg could only

sit, stand, or walk for four hours in an eight-hour work day.

Id.  As support for his opinion, Dr. Richmond cited the neck and

lower back MRIs, which showed degenerative disc disease.  Tr.

744.

    3.   Depression

Fogg also sought treatment for depression during the

relevant time period.  On May 9, 2007, Dr. Calegari prescribed

Celexa in response to Fogg's complaints about depression, poor

appetite, feeling overwhelmed, and an inability to concentrate.

On May 17, Fogg complained of depression to Dr. Friedenberg.

11

On June 20, Dr. Calegari increased Fogg's Celexa prescription in response to her continuing complaints of depression.  At her next appointment on July 12, Dr. Calegari again increased the prescription.  When Fogg returned on August 16, she reported improvement, and Dr. Calegari noted that Fogg was doing well on Celexa.

Upon request from the Office of Social Security Disability Determination, Fogg saw Dr. M. Lorene Sipes, a licensed psychologist, on August 25, 2008.  Along with a depressed mood, Fogg reported experiencing crying spells, hypersomnia, feelings of guilt and worthlessness, and reduced energy, appetite and motivation.  Dr. Sipes concluded that Fogg could comprehend simple oral or written instructions, interact appropriately, manage routine work demands, and concentrate well enough to complete tasks.  She noted that Fogg's long-term memory was below normal limits.  She diagnosed Fogg with a single episode of major depressive disorder, but opined that this would not interfere with her ability to work.

During an appointment with Dr. Kiprop on September 9, Fogg noted that Celexa was helping to manage her depression, and that she was not ready to attend counseling.

On September 17, 2008, Dr. Edward Martin, a non-examining, non-treating physician, reviewed the medical evidence of record.

He summarized Dr. Sipes' conclusions and determined that Fogg's
mental impairment was not severe.

    4.  <u>Dizziness</u>

    Lastly, Fogg was seen for recurrent dizziness.  During an
appointment on November 1, 2006, at The Orthopedic Center, and
another appointment on August 25, 2008 with Dr. Sipes, Fogg
complained of dizziness.  Dr. Kiprop wrote a letter dated
December 2, 2008, stating that Fogg could not work due to
dizziness and unspecified other medical issues.

    On January 13, 2009, Fogg saw a neurologist, Dr. Maureen
Hughes, for her dizzy spells.  Fogg reported that the spells had
begun in the summer of 2008.  She stated that she usually had
time to catch herself before falling, but noted that her ability
to drive was limited.  A brain MRI conducted on January 29,
2009, revealed punctate white matter, which Dr. Hughes reported
was a possible sign of vascular disease or demyelinating
disease.  Tr. 550.  Dr. Hughes planned cervical and lumbar MRIs
to determine if Fogg had a demyelinating disease.  <u>Id.</u>  The MRIs
were performed on February 13, and Dr. Hughes determined that
Fogg's dizzy spells were "less likely" the result of
demyelinating disease, and more likely the result of vascular
disease.  Tr. 551, 553, 557.  Dr. Hughes concluded that further
tests were not appropriate.  Tr. 557.

D. **Administrative History**

In her function report dated July 28, 2008, Fogg described
her daily activities.  Tr. 285.  She stated that she would wake
up, take a shower, take her medication, and eat breakfast.  Id.
She would then watch television.  Id.  Fogg would take the bus
to her appointment, and if she did not have appointments, she
would walk around her parking lot for half an hour and then take
a nap.  Id.  After her nap, Fogg would make and eat lunch and
load her dishwasher.  Id.  Then she would check her to-do list,
and list of things she needed. Id.  She would then watch
television. Id.

Fogg also answered questions related to her ability to
accomplish typical daily tasks.  Tr. 286.  She reported needing
pain medication to sleep and being forced to eat frozen dinners
because she could not stand long enough to cook more elaborate
meals.  Tr. 287.  She also reported doing the dishes every day
and laundry twice a week on her own, and stated that she did not
drive because of her dizzy spells.  Tr. 287, 288.

When asked to describe her abilities in functional terms,
Fogg reported that her back pain left her unable to lift more
than ten pounds.  Tr. 290.  She also reported needing frequent
breaks of five to ten minutes.  Id.

**E.** **Administrative Proceedings**

At the hearing, Fogg testified that her neck and lower back pain limited her ability to lift, bend, and walk. To relieve the pain, she had to spend three days per week lying down with pillows behind her back. She claimed that her depression caused her to cry a couple of times per week, diminished her motivation, and made her unable to get out of bed one to two times per week. She further reported that her stress incontinence forced her to use the bathroom several times a day and led to accidents twice a week that required her to change her clothes. She admitted that physical therapy had helped, but said that she often still experienced incontinence when she coughed or sneezed, though sometimes without any trigger.

Although her dizziness used to occur daily and prevented her from driving for two to three years, Fogg stated that she could now drive and that the spells occurred infrequently. She testified that she did not seek treatment of her back pain or depression with Dr. Richmond because she felt her dizzy spells and renal failure were more pressing. She had not treated her depression because she could not afford counseling.

A vocational expert also testified at the hearing. She stated that Fogg's past work as an electronics worker was classified at the light exertional level. When asked if the ability to do that job would be affected by the need for

15

frequent breaks, she answered that such a break would be considered unscheduled and would likely lead to termination.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review is limited to determining whether the ALJ used "the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference so long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Ortiz, 955 F.2d at 770.  Findings are not conclusive, however, if they are derived by "ignoring

16

evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the Commissioner determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  **ANALYSIS**

Fogg contends that the Commissioner's decision must be reversed because (1) the ALJ failed to properly assess the opinions of her medical providers; (2) the ALJ improperly assessed her credibility; and (3) the ALJ's decision is not supported by substantial evidence. I address each challenge in turn.

A.  <u>Assessment of Opinions of Medical Providers</u>

In finding that Fogg retained the residual functional capacity to perform light work, <u>see</u> 20 C.F.R. § 404.1567(b), the ALJ relied primarily on the opinion of Dr. Jaffe, the agency physician who reviewed Fogg's medical records.  The ALJ gave little weight to the opinions of her treating physicians, Drs. Richmond and Kundu.

In determining whether a claimant is disabled, the ALJ must review all of the relevant evidence, including opinion evidence from providers.  <u>See</u> 20 C.F.R. §§ 404.1527(b), 416.927(b); Social Security Ruling 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006) [hereinafter SSR 06-03p].  If any evidence in the record, including medical source opinions, is inconsistent with other evidence or is internally inconsistent, the ALJ must weigh all of the evidence to determine whether the claimant is disabled. 20 C.F.R. § 404.1527(b).  The opinions of treating physicians are typically entitled to significant weight.  <u>See</u> 20 C.F.R. §§ 404.1502, 404.1527(c)(1).  Fogg argues that the ALJ gave inadequate weight to the opinions of Drs. Richmond and Kundu, her treating physicians, and gave excessive weight to the opinion of Dr. Jaffe, an agency physician.  I agree.

When determining the weight to be given to a physician's opinion, the ALJ should consider: the length of treatment & frequency of examination, the nature and extent of treatment

18

relationship, the sufficiency of explanations with which the
physician supported his opinion, the extent to which the
physician presents relevant clinical and diagnostic evidence to
support his opinion, the consistency of the opinion, and whether
the physician specializes in medical conditions at issue.  20
C.F.R. § 404.1527(c)(2)-(6).  The ALJ must provide "good
reasons" in his written decision for the weight given to an
opinion.  Social Security Ruling 96-2p, 1996 WL 374188, at *5
[hereinafter SSR 96-2p].

        Central to the divergence between Dr. Richmond and Dr.
Jaffe's opinions, is the February 2009 MRI of Fogg's lower back,
which revealed degenerative changes at L4-5.  Tr. 726.
Providers who had access to this study consistently opined that
the degenerative changes were causing Fogg's pain.  See, e.g.,
Tr. 610, 623-24, 630.  Dr. Richmond was Fogg's treating
physician, and the only physician to translate the MRI finding
into functional terms.  Citing the 2009 MRI as support for his
medical source statement, Dr. Richmond opined that Fogg could
not lift more than ten pounds; could not sit, stand, or walk for
more than four hours in an eight-hour workday; and could never
crouch, bend, kneel, crawl, stoop, or balance.  The ALJ
explained that Dr. Richmond's opinion was entitled to little
weight because it was not supported by clinical observations.
Tr. 14.  Contrary to the ALJ's conclusory reason for dismissing

Dr. Richmond's opinion, the 2009 MRI is clinical evidence that Dr. Richmond referenced as support for his opinion.  The ALJ fails to explain why the MRI does not provide objective support, and does not provide another reason that would permit him to discount a treating physician's uncontroverted opinion.

Moreover, the ALJ erred in adopting Dr. Jaffe's opinion without discussing the unavailability of the 2009 MRI to Dr. Jaffe, and the potential impact of that missing evidence.  The ALJ is entitled to weigh conflicting medical opinions, including those of non-treating, non-examining, agency physicians.  See 20 C.F.R. § 404.1527(c); Social Security Ruling 96-6p, 1996 WL 374180, at *2 [hereinafter SSR 96-6p].  When assigning weight to non-treating sources, however, the ALJ must especially consider "the degree to which they provide support for their opinions" based on "all of the pertinent evidence."  20 C.F.R. § 404.1527(c)(3).

The ALJ explained that Dr. Jaffe's opinion was entitled to substantial weight because it was consistent with clinical observations and Fogg's self-reported activities.  Tr. 15.  In his medical source statement dated October 17, 2008, Dr. Jaffe opined that despite some limitations, Fogg retained the functional ability necessary to perform light work.  Tr. 531, 532.  Dr. Jaffe cited various treatment notes through September 2008 to support his position.  Tr. 537.  In his decision to

assign substantial weight to Dr. Jaffe's opinion, however, the ALJ failed to indicate the impact of the next two years of record evidence, in particular the MRI that later formed the basis of Dr. Richmond's opinion.

Because the ALJ's rationale for discounting Dr. Richmond's opinion in favor of Dr. Jaffe's opinion fails to account for the impact of more recent medical evidence, the ALJ's weighing of medical sources is not supported by substantial evidence.  Had the ALJ adopted Dr. Richmond's opinion that Fogg could not lift ten pounds frequently, and could not stand for more than four hours in an eight-hour work day, she would be unable to perform her prior work, which the vocational expert characterized as "light work."  See Social Security Ruling 83-10, 1983 WL 31251, at *5-6 [hereinafter SSR 83-10].  Because the ALJ's improper dismissal of Fogg's treating physicians may therefore have prejudiced Fogg's claim, the case must be remanded for further proceedings.  In light of this result, I need not consider Fogg's additional arguments pertaining to the ALJ's dismissal of Dr. Kundu's opinion.

**B.   <u>Credibility Assessment</u>**

Fogg contends that the ALJ erroneously found her claims of disabling pain not to be credible.  I agree.

Symptoms such as pain can "sometimes suggest a greater severity of impairment than can be shown by objective medical

evidence alone." 20 C.F.R. §§ 404.1529(c), 416.929; Social
Security Ruling 96-7p, 1996 WL 374186, at *1 (July 2, 1996)
[hereinafter SSR 96-7p].  An individual's statements about his
symptoms of pain, however, are insufficient by themselves to
establish that an individual is disabled.  SSR 96-7p at *2.  In
evaluating symptoms such as pain, the ALJ must engage in a two-
step analysis.  Id.  First, he must consider whether the
claimant is suffering from "an underlying medically determinable
physical or mental impairment . . . that could reasonably be
expected to produce the individual's pain or other symptoms."
Id.  If the claimant meets that threshold, the ALJ moves to the
second step where he

> must evaluate the intensity, persistence,
> and limiting effects of the individual's
> symptoms to determine the extent to which
> the symptoms limit the individual's ability
> to do basic work activities.  For this
> purposes, whenever the individual's
> statements about the intensity, persistence,
> or functionally limiting effects of pain or
> other symptoms are not substantiated by
> medical evidence, the adjudicator must make
> a finding on the credibility of the
> individual's statements based on a
> consideration of the entire case record.

Id.[3]

---

[3] Fogg contends that I should adopt the interpretation of SSR 96-
7p advanced by some courts that the phrase "not substantiated by
medical evidence" requires an initial determination that there
is nothing, or little, in the record evidence to support an
individual's claim of pain.  See, e.g., Caille v. Comm'r of Soc.
Sec., 2010 WL 1424725, at *3 (D.P.R. 2010); Guziewicz v. Astrue,

Under the first step, the ALJ found that Fogg's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  Tr. at 14.  That finding is not challenged.  Under the second step, the ALJ found that Fogg's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment."  Id.  I cannot credit this argument because the ALJ ignored relevant evidence and explanations in reaching his credibility determination.

First, the ALJ erred in ignoring medical evidence that contradicted his finding that Fogg's statements were not credible.  The ALJ found significant that in February, March and April of 2009, Fogg reported that her back pain had begun the prior year.  Tr. 555, 630, 652.  The record reveals, however, that Fogg had complained to other physicians about her back pain on multiple occasions in 2006 and 2007.  See, e.g., Tr. 385,

---

2011 WL 128957, at *6 (D.N.H. 2011). Under that analysis, the ALJ would be forced to accept an individual's report of persistence, intensity, and limitations, even if there was a significant amount of evidence in the record contradicting the report.  I decline to read SSR 96-7p in that manner, because it is contrary to First Circuit precedent recognizing that an individual's statements that are consistent with the record can permit a finding of disability only if the ALJ finds them credible.  See Ortiz, 955 F.2d at 769 (finding that ALJ was entitled to determine claimant's complaints of lower back pain were not credible despite ruptured disc at L5-S1 which could be expected to cause pain).

389, 391, 427, 436.  In addition, the ALJ ignored Mr. Plumley's,
PA-C, treatment notes dated July 2006, noting that Fogg had been
evaluated "as far back as 2003 [] with the thought that there's
likely a musculoskeletal component to her pain."  Tr. 483.  The
ALJ's decision provides no rationale as to why isolated
statements in early 2009 are more persuasive than years of
treatment notes from various physicians.

In addition, the ALJ relied on Ms. Brown's clinical
observations that Fogg was able to sleep without difficulty and
had a non-antalgic gait.  Tr. 14.  The same treatment notes,
however, indicate Ms. Brown's ultimate recommendation that Fogg
consider numerous procedures to treat her pain, including a
medial branch block, radiofrequency ablation, steroid injection,
and a surgical consult.  Tr. 630.  The ALJ failed to explain why
the normal clinical findings outweighed Ms. Brown's ultimate
determination that Fogg's pain warranted more aggressive
treatment than medication.[4]

The ALJ's second error was his failure to consider Fogg's
explanations regarding her lack of complaints of back pain
following her visit to Ms. Brown.  Tr. 14.  The ALJ used the
lack of complaints as support for his opinion that Fogg's pain

---

[4] Fogg's counsel also contends that the ALJ improperly
substituted his own medical opinion by citing Ms. Brown's
observations that Fogg's sleep was undisturbed and that she had
a non-antalgic gait.  In light of the outcome, I need not
address that contention.

was not as intense, persistent, or limiting as she claimed.  Id.
Before drawing "any inferences about an individual's symptoms
and their functional effects from a failure to seek or pursue
regular medical treatment," however, an ALJ must "consider[] any
explanations that the individual may provide."  SSR 96-7p at *7.
For example, "[t]he individual may have been advised that there
is no further, effective treatment that can be prescribed and
undertaken that would benefit the individual" or "[t]he
individual's daily activities may be structured so as to
minimize symptoms to a tolerable level or eliminate them
entirely."  Id. at *8.

      Fogg contends that she was focused on her more urgent renal
condition following her visit with Ms. Brown.  Doc. No. 8-1 at
13, 16.  During her appointment with Ms. Brown, Fogg was
informed that she should consider treatment options beyond pain
medication, such as medial branch block, radiofrequency
ablation, steroid injections, or a surgical consult.  However,
Ms. Brown noted that an aggressive treatment path was not
prudent until Fogg's renal evaluation was complete.  Tr. 630.
Although the ALJ was entitled to find that the lack of options
was not sufficient to explain Fogg's lack of complaints, there

is nothing to indicate that he considered it as a possible explanation.[5]

Because the ALJ ignored record evidence and failed to consider possible explanations for Fogg's failure to pursue treatment for her back pain in 2010, his credibility findings are not based on substantial evidence. Had the ALJ found that Fogg's back pain required her to recline frequently there would be no work available for Fogg, according to a hypothetical asked of the testifying vocational expert. Tr. 50. Because the ALJ's improper dismissal of Fogg's subjective statements of pain may therefore have prejudiced Fogg's claim, the case must be remanded for further proceedings. In light of this result, I need not consider Fogg's additional arguments pertaining to the ALJ's credibility determination of her depression, nor need I consider the ALJ's alleged failure to base his RFC on substantial evidence.

### IV.  CONCLUSION

For the foregoing reasons, I grant Fogg's motion to reverse (Doc. No. 8), deny the Commissioner's motion to affirm (Doc. No. 10), and pursuant to 42 U.S.C. 405(g), remand this case to the

---

[5] The record does indicate that after Fogg's renal evaluation was complete, she still did not seek further treatment for back pain because she was unable to obtain transportation. Tr. 688. Again, the ALJ was entitled to find this explanation insufficient, but should have addressed it.

Social Security Administration.  The clerk is directed to enter

judgment accordingly.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge


July 6, 2012

cc:  Elizabeth R. Jones, Esq.
     Robert J. Rabuck, Esq.